UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NOEL D. WOODS,

      Plaintiff(s),

v.                        CASE NO.   8:02-CV-413-T-17EAJ

UNITED STATES OF
AMERICA,

      Defendant(s).

_____/

## MEMORANDUM OPINION

This matter came on for trial before this Court, sitting
without a jury, on February 18, 19, 23, 24, 25, and 26, 2004 and
on October 4, 5, 6, 18, 19, 20, and 21, 2004.   Plaintiff Noel D.
Woods has brought a claim for medical malpractice under the
Federal Tort Claims Act.   Plaintiff Woods had a total hip
replacement surgery at Bay Pines VA Hospital on April 8, 1999.
Plaintiff became legally blind after the surgery, and attributes
his blindness to alleged negligence by VA physicians before,
during and after the surgery.

Plaintiff Woods has an extensive medical history in the care
of the VA, and the Court has examined Plaintiff's medical history
as presented in the records which have been filed as Exhibits.
In order to provide a context for the Court's rulings, the Court
briefly summarizes Plaintiff's medical history and the course of
his treatment at the Bay Pines VA Medical Center which is the
subject of this case.   The Court has also examined the thirteen
volumes of trial transcript (2800 pages) which have been filed in
this case.

Case No. 8:02-CV-413-T-17EAJ

After consideration of the testimony, both lay and expert, exhibits, pre-trial stipulation, and arguments of counsel, the Court makes the following findings of fact and conclusions of law.  To the extent any of the findings of fact might constitute conclusions of law, they are adopted as such.  To the extent any legal conclusions constitute a finding of fact, they are adopted as such.

Plaintiff filed an Amended Motion for Directed Verdict (Dkt. 106).  The motion is **denied**.

I.  Findings of Fact

1.  This Court has jurisdiction of this case pursuant to the Federal Tort Claims Act, ("the Act"), 28 U.S.C. Sec. 1346(b) and 2671, et seq.

2.  This action arises under the Act from medical care which was rendered at Bay Pines VA Medical Center, Clearwater, Florida, on or about April 8, 1999 and thereafter.

3.  Plaintiff Noel D. Woods was at all relevant times a resident of Pinellas County, Florida.

4.  Plaintiff fulfilled the administrative requirements of the Act, and received a denial letter as to his claim before filing this lawsuit (Dkt. 1, Exh. A).

Case No. 8:02-CV-413-T-17EAJ

A.   Plaintiff's Service

     5.   Plaintiff had a successful career in the U.S. Air Force
for 14 years until 8/4/1975 when he contracted dysentery while on
leave in Mexico (Exh. 128, V.A. 323, 473).  After the dysentery
resolved, Plaintiff suffered recurring joint pains,
conjunctivitis and urethritis.  After treatment at other
facilities, Plaintiff was admitted to the Long Beach VA Hospital
with a diagnosis of Reiter's syndrome and psoriasis on 12/5/1975.
Plaintiff was given a rehabilitation program for his severe
arthritis (Exh. 128, V.A. 648-649), as well as driving training
and vocational counseling.  He was discharged from the hospital
on March 3, 1976, and continued outpatient therapy.  Plaintiff
was issued a wheelchair for mobility.

B.   Plaintiff's Disability Discharge

     6.   During his hospitalization, Plaintiff received temporary
total disability compensation, and Plaintiff applied for 100%
service-connected compensation (Exh. 128, V.A. 479), which he was
later awarded.  Plaintiff had also applied for and received
Social Security disability benefits.

     7.   After discharge from the hospital, Plaintiff attended a
local college, taking business administration classes.  Plaintiff
suffered a relapse, and withdrew from school.  In 1977 Plaintiff
returned to school, and intended to study law after moving from
California to Arizona (Exh. 128, V.A. 323).  Plaintiff had
transportation difficulties in attending school, and by
September, 1978, was totally dependent on his wheelchair.  (Exh.
128, V.A. 323, 328).

Case No. 8:02-CV-413-T-17EAJ

8.   A Compensation and Pension examination was scheduled in
September, 1978 to evaluate Plaintiff's service-connected
disabilities and functional overlay (Exh. 128, V.A. 320).   A
Certificate of Medical Feasibility for Specially Adapted Housing
was issued (Exh. 128, V.A. 326).

C.   VA Treatment of Plaintiff's Disabilities

9.   Plaintiff's medical records include admissions in
Scottsdale, Arizona (Exh. 128, V.A. 840) in October, 1979,
treatment in Cocoa Beach, Florida from May, 1980 (Exh. 128, V.A.
720) through 1987 (Exh. 128, V.A. 712), and treatment in Daytona
Beach, Florida in 1986 (Exh. 128, V.A. 758, 809).   The medical
records indicate that in 1987 Plaintiff's chart was to be
transferred to the Tampa VA Hospital (Exh. 128, V.A. 679), and
that Plaintiff consulted fee-based medical providers on occasion.

D.   Diagnosis of AVN

10.   Plaintiff moved to Clearwater, Florida in 1987 and was
treated for his health conditions at Bay Pines VA Hospital from
1987 until he was discharged after his hip surgery in 1999 (Exh.
128, Vols. 4-5).

11.   Plaintiff had a bone scan in July, 1998 (Exh. 128,
V.A. 1461) and an MRI of his left hip in August, 1998 (Exh. 128,
V.A. 1459).   In November, 1998, Plaintiff was diagnosed with
avascular necrosis (AVN) of the left hip (Exh. 128, V.A. 1451).

4

Case No. 8:02-CV-413-T-17EAJ

12.  Avascular necrosis is a disease that results from the loss of blood supply to the bone.  AVN may arise from traumatic causes such as injury, fracture or damage to the blood vessels, or from non-traumatic causes, such as the long-term use of corticosteroids, or excessive long-term use of alcohol.

13.  In November, 1998, Plaintiff deferred surgery until after a trip to California.  The medical records state that Plaintiff's hypertension and lipids were stable at that time (Exh. 128, V.A. 1448).

14.  On March 16, 1999, Plaintiff was scheduled for hip replacement surgery (Exh. 128, V.A. 1445).  At that time Plaintiff complained that he thought he had a flare-up of iritis, and wanted to go to the eye clinic (V.A. 1445).  Iritis is an inflammatory disorder of the colored part of the eye, the iris, and its symptoms include light sensitivity, red eye, blurred vision, tearing, pain, and sometimes floaters.  Iritis is occasionally just one symptom of the connective tissue diseases from which Plaintiff suffers, rheumatoid arthritis and Reiter's syndrome.  The medical records state that only mild scleral conjunctivitis was present on physical examination (V.A. 1445).  The Court has only found one other instance of iritis in Plaintiff's medical history, which took place in 1975. (Exh. 128, V.A. 348, 892).

15.  On March 16, 1999, Plaintiff was referred to the ophthalmology clinic for a routine consult to rule out iritis (Exh. 128, V.A. 1443).

Case No. 8:02-CV-413-T-17EAJ

G.   Pre-Surgery Preparation

16.   Plaintiff's hip surgery was originally scheduled for
March 5, 1999 (Exh. 128, V.A. 1172).  A history and physical exam
was done on February 23, 1999.  The medical records of the exam
state a history of renal insufficiency (Exh. 128, V.A. 1173).
Plaintiff denied diabetes (DM), atherosclerotic heart disease
(ASHD), chronic obstructive pulmonary disease (COPD), deep venous
thrombosis/pulmonary embolism (DVT/PE), peptic ulcer disease
(PUD), hepatitis and seizures.  On February 26, 1999, Dr.
Elzayat, the anesthesiologist, performed a pre-anesthesia
evaluation.  On March 1, 1999, the surgery was cancelled (Exh.
128, V.A. 1178) due to the physician's illness.

17.   Plaintiff's surgery was rescheduled for April 8, 1999.
A history and physical exam was again done on March 31, 1999
(Exh. 128, V.A. 1179-1182).

H.   Surgery

Plaintiff was admitted to the Orthopedic Service at Bay
Pines on 4/8/1999.  A left total hip arthroplasty was performed
by Dr. John Camblin, during which there were no complications
(Exh. 128, V.A. 44, 74).

I.   Post-Surgery

Plaintiff recovered satisfactorily immediately after the
surgery, and was returned to his room (Exh. 128, V.A. 46).  On
the evening of 4/8/1999, Plaintiff's temperature was elevated to
103.5, and Tylenol was prescribed.  The medical records of

6

Case No. 8:02-CV-413-T-17EAJ

4/9/1999 state that Plaintiff was encouraged to force fluids, to deep breathe, to cough, and use an incentive spirometer (Exh. 128, V.A. 49). Plaintiff was also treated with a nebulizer (Exh. 128, V.A. 54, 56, 58, 61, 67, 71).

The medical records of 4/10/1999 (Exh. 128, V.A. 62) contain the first observations of Plaintiff's agitation and anger at his treatment.

The medical records of 4/11/1999 contain additional observations of Plaintiff's anger and agitation (Exh. 128, V.A. 63), as well as statements that Plaintiff would have his lawyer take care of alleged mistreatment.  Plaintiff was shown records documenting the medications that were administered (Exh. 128, V.A. 64).

The medical records of 4/11/199 state that Plaintiff remained agitated.  (Exh. 128, V.A. 68).  Dr. Camblin was paged. Nurse Coleman discussed possible drug interactions with the Pharmacy.  The medical record states that "No tremors [were] noted except when [patient] becomes agitated re 'meds'" Nurse Coleman also states "No hallucinations."  Dr. Camblin ordered that percocet (a pain medication) be stopped and an EKG be done.

The medical records of 4/11/1999 state that Plaintiff is on albuterol caps, and is having respiratory treatments containing albuterol, which may be causing Plaintiff's "hyper" state. (Exh. 128, V.A. 69).

Case No. 8:02-CV-413-T-17EAJ

On 4/11/1999, the medical records state that Plaintiff's sister has noticed forgetfulness in her brother (Exh. 128, V.A. 70), and Nurse Adams noticed disorientation.

On 4/11/1999, the medical records also state that Plaintiff has periods of short term confusion related to short term memory (Exh. 128, V.A. 77).

On 4/12/1999, the medical records states that Plaintiff is in "good spirits without agitation." (Exh. 128, V.A. 80).  The records also state that nursing staff has noticed "lapse in short term memory." (Exh. 128, V.A. 81).  A neurological consultation was requested.

On 4/13/1999, the medical records state that Plaintiff recalls "fuzzy memory" after surgery but is thinking clearly now. (Exh. 128, V.A. 85).

On 4/14/1999, the medical records state that Plaintiff complains of visual disturbances; "Things are fuzzy and cloudy." (Exh. 128, V.A. 91, 92).  The visual disturbances also include Plaintiff being able to see his own breath and air that trails when he moves his hands in the air.  An ophthalmology consultation, placed as routine, was requested.

Plaintiff was transferred from the orthopedic service to the rehabilitation unit on 4/15/1999.  At that time Plaintiff continued to complain of visual disturbances in the form of bilateral patchy red spots.

Case No. 8:02-CV-413-T-17EAJ

On 4/16/1999 Plaintiff reported occasional visual hallucinations, such as a beagle dog running across the clinic. Plaintiff was able to participate in physical therapy.

On 4/17/1999, Plaintiff requested an outside ophthalmologist be brought in to examine him.  Plaintiff threatened to leave the hospital, and, according to the progress notes, continued to try and intimidate the staff with threatening statements about lawyers.

On 4/19/1999, the medical records state that Plaintiff continues to see spots on both eyes.

On 4/20/1999, the medical records state that Plaintiff was upset because he had not been seen by a neurologist nor an ophthalmologist.  An ophthalmology consultation was obtained.

On 4/21/1999, a psychology consultation was obtained.  A personality assessment was performed, which indicates that Plaintiff presented a wide range of chronic somatic symptoms and that there was likely to be psychological factors involved in the complaints.  A neurology consultation was obtained.  Plaintiff was scheduled for an MRI and an optometry consultation.

The medical record of 4/23/1999 states that Plaintiff became aggressive when asked to comply with the rehabilitation program, and threatened to stop eating meals and call his lawyer.  The note states that Plaintiff states he cannot see, but watches television, uses his telephone and eats his tray without assistance.  The notes further states that Plaintiff stated "I can leave at any time, I don't need to take this, I can apply

9

Case No. 8:02-CV-413-T-17EAJ

pressure and I know how to do it."

The medical record of 4/25/199 states that Plaintiff went to
the dining room for supper, ate well and was independent in "adl"
(activities of daily living).

The medical record of 4/26/199 shows that Plaintiff
complained about not yet having an MRI or seeing Dr. Cruz (the
neurologist.)  Plaintiff's MRI was scheduled for the following
Monday, and the neurologist was to see him after the MRI.  The
MRI was performed on 4/26/1999.

On 4/28/1999, Plaintiff had not yet seen Dr. Cruz and
demanded to see him.  The medical record further states that
Plaintiff verbalized that he is completely blind, but requested
his New Balance sneakers.  While holding the sneakers directly in
front of Plaintiff, Nurse Yelvington asked him "Are these the
shoes" and Plaintiff looked directly at the shoes and said "yes."
Nurse Yelvington further reported that Plaintiff looked directly
into her eyes and can follow her with his eyes while talking to
her.  Nurse Yelvington states she purposely tested Plaintiff to
see if he is truthful about his blindness.  Nurse Yelvington
further reports that Plaintiff commented about issues on
television while directly looking at television.  Nurse
Yelvington further states that when confronting Plaintiff about
his blindness in regards to his shoes he replied "I can see part
of them."  The record further states that Plaintiff demonstrated
eye muscle control and his eyes do not shift involuntarily while
they are open.

Case No. 8:02-CV-413-T-17EAJ

The physician progress note of 4/28/1999 states that Plaintiff has met his rehabilitation goals as to the hip replacement, and has no hip pain.  The note further states that Plaintiff complains about not being able to see, but is able to identify objects and constantly watches television.  Plaintiff was to be discharged on 4/29/1999 with transportation to his home.

A "Medicine Nursing Note" of 4/28/1999 states that Plaintiff has periods where "it looks like smoke and he is unable to recognize objects."  On that day Plaintiff stated his vision is better and not cloudy.  The note reports that Plaintiff ate all of his dinner and later was resting in bed watching television.

On 4/29/1999, the "GREC Nursing Note" details the attempts to obtain an optometry consultation.  Plaintiff was to be seen in the Optometry Clinic on 4/30/1999, with his discharge postponed.

On 4/30/1999, a visual field exam was performed, and the results were given to Dr. Chamikles, an ophthalmologist, for evaluation.

On 4/30/1999 Dr. Chamikles examined Plaintiff and told Plaintiff he was legally blind.  Plaintiff saw Maryann Nolan, the VIST coordinator, before Plaintiff's discharge, and services for the visually impaired were explained.  The "GREC Nursing Note" states that "Patient is adamant that he be discharged home today."

11

Case No. 8:02-CV-413-T-17EAJ

    Plaintiff was discharged from Bay Pines on 4/30/1999.
Plaintiff received follow-up care at Bay Pines VA Medical Center
as well as James A. Haley VA Hospital in Tampa, Florida.

II.  Conclusions of Law

A.  Federal Tort Claims Act

    The jurisdiction of this Court is invoked pursuant to the
Federal Tort Claims Act ("FTCA"), 28 U.S.C. Sec. 1346(b) and
Secs. 2671-2680.  By abrogating sovereign immunity, the FTCA
enables a plaintiff to recover money damages from the United
States arising from personal injuries caused by the negligent or
wrongful act or omission of any employee of the Government while
acting within the scope of his office or employment, under
circumstances where the United States, if a private person, would
be liable to the claimant in accordance with the law of the place
where the act or omission occurred.

    When Plaintiff Woods received treatment at the VA in
connection with the total hip replacement on April 8, 1999, Dr.
John Camblin was the orthopedic surgeon and Dr. Selim Elzayat was
the anesthesiologist for the surgery.  At all times relevant to
this action, Dr. Camblin and Dr. Elzayat were employees of the
United States Government, acting within the scope of their
employment for purposes of the FTCA.  In addition, other
physicians, physician's assistants, nurses, therapists and other
health care providers employed by Bay Pines VA Medical Center
rendered care to Plaintiff Woods during the relevant time.
Plaintiff's medical records have been made Exhibits (128, 129) in
this case, and the records contain the names of the other health

                              12

Case No. 8:02-CV-413-T-17EAJ

care providers.

B.   Choice of Law

     In an action for negligence under the FTCA, the district
court must apply the substantive law of the state wherein the
allegedly negligent act or omission occurred.   28 U.S.C. Sec.
1346(b).   Any damages assessed pursuant to the FTCA must also
conform with state law.   Bay Pines VA Hospital is located in
Clearwater, Florida.   The Court is required to apply Florida law
to the facts of this case.

C.   Negligence Standard - Medical Malpractice

     In negligence actions, plaintiffs are required to prove each
of the following four elements: duty, breach, causation and
damages.   See Jefferies v. Amery Leasing Inc, 698 So.2d 368, 371
(Fla. 5th DCA 1997).   These elements are applicable to medical
malpractice actions.   See Riegel v. Beilan, 788 So.2d 990, 991
(Fla. 2d DCA 2000).

1.   Duty of Care

     The medical negligence standard of recovery is set forth in
section 766.102(1), Florida Statutes, which states in part:

                    In any action for recovery of damages based
               on death or personal injury of any person in
               which it is alleged that such death or injury
               resulted from the negligence of a health care
               provider as defined in s. 766.202(4), the
               claimant shall have the burden of providing
               by the greater weight of the evidence that

                              13

Case No. 8:02-CV-413-T-17EAJ

        the alleged actions of the health care
        provider represented a breach of the
        prevailing professional standard of care for
        that health care provider.  The prevailing
        professional standard of care for a given
        health care provider shall be that level of
        care, skill and treatment which, in light of
        all relevant surrounding circumstances, is
        recognized as acceptable and appropriate by
        reasonably prudent similar health care
        providers.

     Dr. Camblin is a specialist in orthopedics (Dkt. 47, p. 157,
l. 16-17).  Dr. Elzayat is a specialist in anethesiology (Dkt,
110, pp. 2130-2132).

2.  Breach of Duty of Care

a.  Plaintiff's Theory

     Plaintiff's theory of this case is that Defendant, through
its agency and employees:

    1) Failed to properly perform and render medical
    treatment of Plaintiff's condition;

    2) Failed to recognize the true nature of Plaintiff's
    condition;

    3) Failed to authorize or perform proper diagnostic
    tests or studies to determine the true nature of
    Plaintiff's condition;

    4) Failed to properly monitor Plaintiff's condition,
    including but not limited to complaints of visual
    disturbances;

    5) Failed to obtain proper consultation;

14

Case No. 8:02-CV-413-T-17EAJ

6) Failed to properly react to Plaintiff's medical needs in an orderly and timely fashion;

7) Failed to select and retain competent staff physicians;

8) Failed to properly hire, train and supervise the staff members caring for the Plaintiff;

9) Failed to adequately prepare for contingencies that would arise during and after the surgery which was expected to result in significant blood loss;

10) Failed to monitor blood loss during and after the surgery and failed to properly compensate for such blood loss;

11) Failed to properly monitor the hematocrit of Plaintiff during and after surgery and failed to take appropriate action to maintain an adequate level during and after the surgery;

12) Failed to properly monitor the hemoglobin of Plaintiff during and after surgery and failed to take appropriate action to maintain an adequate level during and after surgery;

13) Failed to properly monitor the pulmonary ventilation of Plaintiff during and after surgery and failed to take appropriate action to maintain an adequate level during and after surgery;

14) Failed to properly monitor the blood pressure of Plaintiff and failed to maintain adequate blood pressure during and after the surgery;

15) Failed to properly advise or warn Plaintiff of the risks involved in such surgery and specifically the risk of blindness and therefore failed to obtain Plaintiff's informed consent;

16) Failed to follow a reasonable protocol which would substantially reduce the possibility of blindness in circumstances such as those involving Plaintiff;

Case No. 8:02-CV-413-T-17EAJ

    17) Failed to monitor the condition of Plaintiff during
and after the surgery and take the appropriate actions
to reduce the risk of blindness by adjusting their
surgical procedures during surgery and care after
surgery;

    18) Failed to develop a specific surgery plan in view
of the known risks involved.

    To briefly summarize, Plaintiff contends that the VA health
care providers did not competently evaluate his medical condition
before surgery through appropriate review of medical records and
diagnostic testing, did not warn Plaintiff of the risk of
complications for the elective surgery, did not perform a blood
transfusion during surgery, did not adequately monitor Plaintiff
during surgery, did not competently evaluate Plaintiff's medical
condition after surgery through monitoring, testing and
appropriate consultation, and did not perform a blood transfusion
after surgery or otherwise render medical treatment that would
have improved Plaintiff's vision.

    Plaintiff offers the expert testimony of Dr. Harry
Hamburger, who practices opthalmology and neuro-opthalmology, as
to causation.  Plaintiff also offers the expert testimony of Dr.
Robert Guskiewicz as to the standard of care applied to
anesthesiology and blood transfusions.

b.  Defendant's Response

    Defendant contends that the health care providers of Bay
Pines VA Medical Center did not breach any duty to comply with
the applicable standard of care.  Defendant disputes Plaintiff's
theory that the injury to Plaintiff's vision could have been
prevented or, once it occurred, could have been cured.  Defendant

16

Case No. 8:02-CV-413-T-17EAJ

argues that the cause of posterior ischemic optic neuropathy
("PION") is not known to medical science at the present time.
Since the cause is not known, the means to prevent PION is also
not known.  Defendant contends that there is no known treatment
to cure PION which occurs in the perioperative setting.

Defendant offers the expert testimony of Dr. Nancy Newman, a
neuro-opthalmologist, as to the cause and treatment of PION.
Defendant also offers the expert testimony of Dr. Steven Roth as
to the standard of care applied to anesthesiology and blood
transfusions.

c.   General Resolution

The question that the Court must answer is whether Plaintiff
has proven by a preponderance of credible evidence that the
physicians and staff of the Bay Pines VA Medical Center acted
negligently in their treatment of Mr. Woods.  In order to make
that determination, the Court must determine if the physicians
and staff acted reasonably and in accordance with the average
degree of care and skill exercised by similarly qualified medical
personnel in similar circumstances.

The parties have offered conflicting expert testimony as to
the reasonableness of the medical care of Mr. Woods at the VA
Medical Center.  Since complex medical issues in this case are
beyond the common knowledge of this Court, Plaintiff must first
establish by expert testimony the degree of skill and care
exercised by qualified practitioners in comparable circumstances,
and then that Defendant departed from that standard.

17

Case No. 8:02-CV-413-T-17EAJ

Although there have been challenges to the admission of
expert testimony in this case, the Court has admitted all of the
testimony.  There is a sharp dispute between the opinions of
Plaintiff's expert witnesses and those of Defendant's expert
witnesses.  In choosing which expert opinions on which to rely,
the Court must make a determination of credibility.  In doing so,
the Court has considered the education, training, experience and
overall credentials of the expert witnesses in this case.  The
Court has also evaluated inconsistencies in testimony and
possible bias.

After consideration, the Court finds that the expert
witnesses who testified on behalf of Defendant, Dr. Nancy Newman
and Dr. Steven Roth, exhibited a level of knowledge and
experience superior to that of Plaintiff's experts, and their
testimony assisted the Court in its understanding the facts of
this case.

Plaintiff's expert witnesses and Defendant's expert
witnesses hold different opinions about the treatment of
Plaintiff.  Qualified physicians may differ as to what
constitutes a preferable course of treatment in a particular
case.  This difference of opinion does not necessarily amount to
medical malpractice.  Based on the opinion of Dr. Newman, the
Court concludes that the physicians and staff at the Bay Pines VA
Medical Center could not reasonably have foreseen that Plaintiff
would develop PION after hip replacement surgery.  Based on the
opinion of Dr. Roth, the Court concludes that the VA physicians
did not deviate from the required standard of care in electing to
use a Constavac to reinfuse Plaintiff's own blood rather than
performing a blood transfusion.

18

Case No. 8:02-CV-413-T-17EAJ

d. Specific Allegations of Negligence

     This case was a difficult case because of the volume of
factual information presented.  It was necessary for the Court to
sift through the trial testimony, depositions, the medical
records and other documentary evidence in order to come to an
understanding of what happened.  Along the way, the Court made
certain credibility determinations in order to make sense of the
evidence.  However, there are certain factual issues that remain
unresolved, and which will forever remain mysteries because the
Court has determined it is not necessary to resolve those issues.
The Court cannot know the unknowable.  Only the parties
themselves know the truth about certain issues.  The Court notes
the unusual fact pattern of this case i.e. the diagnosis of
Plaintiff's PION is not similar to other reported cases of PION,
nor is the record of Plaintiff's vision tests.  In attempting to
understand the facts, the Court was required to assess the
credibility of Plaintiff as well as the staff of Bay Pines who
rendered care to Plaintiff.

     Plaintiff presents himself in this case as struck down in
his prime, with a complete end to his travels, his independence
and his social life.  Plaintiff testified that he has overcome
many obstacles in life, had a wonderful life, and now will be
unable to contribute to the world to make it a better place.

     Plaintiff's history indicates that he has been completely
disabled from working since 1976, and has received VA benefits
since that time.  Plaintiff's records document that Plaintiff has
coped with severe crippling arthritis for many years, but
achieved a comfortable plateau, having preserved his independence

                              19

Case No. 8:02-CV-413-T-17EAJ

and mobility.

Plaintiff's past records also indicate that he has coped
with situational depression and anxiety.  Plaintiff was assessed
after his surgery on 4/21/199 and found to be prone to
narcissistic traits and grandiosity.

Plaintiff's voluminous records of treatment by the VA reveal
that Plaintiff is extremely familiar with the VA system and how
to maneuver within the system.  The records also show that
Plaintiff has been perceived as manipulative by providers within
the VA system (Exh. 128, V.A. 452).  While he was hospitalized,
Plaintiff was vocal about his ability to apply pressure to get
what he wants.

After considering Plaintiff's trial testimony and the
medical records, the Court finds it must view Plaintiff's
testimony with skepticism, especially in light of Plaintiff's
early threats to enlist the aid of his counsel.  The Court has
doubts about Plaintiff's veracity in reporting his symptoms
accurately.

In discussing the various specific allegations of
negligence, the Court bears in mind that the ultimate diagnosis
of Plaintiff's visual impairment is posterior ischemic optic
neuropathy, a perioperative complication which is extremely rare.
Dr. Hamburger and Dr. Newman agree on that issue.  Some treating
and/or examining physicians concluded that Plaintiff's visual
impairment was caused by anterior ischemic optic neuropathy
("AION"), which involves a different set of observable symptoms
than PION.

Case No. 8:02-CV-413-T-17EAJ

1.  Failure to Adequately Evaluate Plaintiff's Medical
    Condition before Surgery

     Plaintiff was in the care of the VA for many years, and
Plaintiff's medical records were available to his physicians.
Plaintiff had various health problems in addition to avascular
necrosis of his left hip.  These include rheumatoid arthritis,
hypertension, Reiter's syndrome, psoriasis, and possible chronic
renal failure.   Plaintiff's health problems are detailed in his
medical records.

     The reason this issue is important is that certain risk
factors, such as hypertension, are associated with PION.
However, having risk factors is not the same as establishing
causation.  During the trial, the Court posed questions to the
witnesses to determine if Plaintiff's prior problems could have
put Plaintiff at increased risk for developing PION.

     To the extent that Plaintiff alleges that the failure to
adequately evaluate his medical condition before surgery caused
his injuries, the Court finds that Plaintiff's physicians did not
deviate from the required standard of care.  Plaintiff's
physicians did not evaluate the complete records, which were
voluminous.  Plaintiff's physicians examined Plaintiff, consulted
certain records, took a history, and performed diagnostic tests
to confirm that state of Plaintiff's health immediately before
surgery.  The medical records establish what Plaintiff's
physicians actually did before surgery.  Based on Dr. Newman's
testimony that the current state of medical science is such that
the cause of PION is unknown, Plaintiff has not established that
any failure to adequately evaluate Plaintiff's medical history
before surgery caused his injuries.

Case No. 8:02-CV-413-T-17EAJ

2.   Failure to Warn Plaintiff of Risk of Complications

     Plaintiff executed consent forms before surgery.  The
consent forms did not specifically warn of the risk of developing
PION following hip replacement surgery.  PION is an extremely
rare complication.  Dr. Newman testified that this complication
has been associated with lengthy open heart surgery and lengthy
spine surgery, and does not appear in the literature to be
associated with a three hour hip replacement surgery performed in
the lateral position.

     After consideration, the Court finds it is not a deviation
from the required standard of care for the consent forms to
contain no reference to the risk of PION.

3.   Failure to Perform Blood Transfusion During Surgery

     There was a considerable amount of expert testimony about
how much blood Plaintiff lost during surgery, the correct way to
estimate blood loss during surgery, whether autologous blood
should have been available to Plaintiff, alternative means of
replacing lost blood, or whether a blood transfusion was
necessary in order to meet the required standard of care.

     Plaintiff did not donate his own blood before surgery.  The
option to do so was offered to Plaintiff, but Plaintiff elected
not do so.

     The decision to transfuse during surgery is one that is the
responsibility of the anesthesiologist, in this case, Dr.
Elzayat.  Based on his observation and monitoring of Plaintiff

                                22

Case No. 8:02-CV-413-T-17EAJ

during surgery, Dr. Elzayat did not transfuse Plaintiff during
surgery.

Dr. Steven Roth and Dr. Robert Guskiewicz disagree about
what the standard of care for transfusion of blood during surgery
was in 1999.  Dr. Guskiewicz testified that predonated autologous
blood was required to be available to meet the standard of care.
Dr. Roth testified that either the autotransfuser or Constavac,
or predonated autologous blood were required by the applicable
standard of care.

The Court concludes that the testimony of Dr. Steven Roth is
more credible.  Dr. Roth's opinion is that the failure to have
autologous blood available and the failure to perform a blood
transfusion was not a deviation from the required standard of
care.

In this case, the treating physician, Dr. Camblin, testified
that Plaintiff lost 1530 cc's of blood, and 400 cc's were
reinfused with the Constavac, for a net loss of 1130 cc's.  There
was conflicting testimony about this issue, but the Court accepts
Dr. Camblin's testimony that Plaintiff lost 1000 cc's during
surgery, and the rest afterward. After surgery, Plaintiff did
develop moderate anemia due to blood loss, which Dr. Camblin
treated conservatively with iron supplements.

The medical records do not show any specific event during
the three hour surgery that necessitated transfusion.  After
consideration, the Court finds that the failure to transfuse
Plaintiff during surgery was not a deviation from the required
standard of care.

23

Case No. 8:02-CV-413-T-17EAJ

4.  Failure to Monitor Plaintiff During Surgery

     This topic area includes monitoring of all of Plaintiff's
vital signs, including blood pressure, hemoglobin, pulmonary
ventilation and any other signs.  The medical records speak for
themselves.  After reviewing the medical records, and considering
the expert testimony in this case, the Court concludes there was
no deviation from the required standard of care.

5.  Failure to Competently Evaluate Plaintiff's Medical Condition
    After Surgery

     After surgery, Plaintiff was in pain, and was medicated for
the pain.  In addition, Plaintiff developed a fever and was
treated for respiratory symptoms, for which medication was given.
Plaintiff exhibited confusion and short-term memory loss, and had
some hallucinations.  Plaintiff was monitored and treated for
these conditions.

     Plaintiff was monitored by Dr. Elzayat until he was released
from the post-anesthesia care unit ("PACU").  After that,
Plaintiff's care was the responsibility of Dr. Camblin and was
monitored by Dr. Camblin.

     The nursing notes document Plaintiff's agitation and
hallucinations in the days following surgery.  Dr. Camblin
changed Plaintiff's medication and ordered tests.  After the
change in Plaintiff's medication, Plaintiff's agitation resolved.

     Plaintiff did not report visual disturbances until April 14,
1999.  Thereafter, the Court notes that neurological
consultations and opthalmological consultations were requested,

24

Case No. 8:02-CV-413-T-17EAJ

but were not immediately performed.

The Court does not know what event compromised Plaintiff's
vision, or exactly when the event which compromised Plaintiff's
vision occurred.  Plaintiff did not awake after surgery and
immediately announce "I can't see."  The complaints of visual
disturbances did not start until April 14, 1999.  Plaintiff
contends that the visual disturbances actually started earlier.
The medical records document that nurses observed Plaintiff
watching television and using the phone during the time he
complained of visual disturbances.

Dr. Newman testified that although PION is known to occur
in the perioperative setting after surgeries which involve blood
loss and anemia, the amount of blood loss which occurred in this
case and the type of surgery do not typically result in PION.

Dr. Newman further testified that PION occurs after the
blood vessels in the posterior part of the eye are infarcted for
90 minutes.  If Plaintiff's PION occurred during surgery, then no
amount of monitoring would have made any difference.  Dr. Newman
testified that PION is irreversible, and there is no known
treatment to cure it.  Once the optic nerve dies, it is dead.

The medical records document that physicians and staff did
monitor Plaintiff's condition after surgery.  What happened is
that conservative treatment for Plaintiff's symptoms was rendered
first.  Again, after 90 minutes, no amount of monitoring or
consultation would have made any difference.  There was no basis
for Dr. Camblin to initially suspect PION given the uneventful
surgery and the amount of blood loss associated with it.

Case No. 8:02-CV-413-T-17EAJ

Plaintiff's subsequent symptoms could have meant any number of
health problems were occurring.  After consideration, the Court
concludes that there was no failure to adequately evaluate
Plaintiff's condition after surgery.

6.  Failure to Perform Blood Transfusion After Surgery

    There is expert testimony from Dr. Hamburger and Dr.
Guskiewicz that it was a deviation from the required standard of
care not to perform a blood transfusion after surgery, given the
amount of Plaintiff's blood loss and Plaintiff's complaint of
visual disturbances.

    Dr. Newman testified that there is no known treatment to
cure PION in the perioperative setting.  In other settings,
various treatments have been attempted to salvage the patient's
vision.

    The Court concludes that it was not a deviation from the
standard of care not to  perform a blood transfusion after
surgery.

III.  Causation

    The Court observed earlier that there are unanswered
questions associated with this case.  If the surgery triggered
Plaintiff's vision loss, the Court does not know why Plaintiff
did not complain of vision loss immediately after surgery at a
time when he was awake enough and alert enough to be complaining
about other things.   If Plaintiff in fact had PION, and PION is
not progressive, the Court does not know why Plaintiff's vision

Case No. 8:02-CV-413-T-17EAJ

improved and then again deteriorated severely.  This was
documented by subsequent vision testing at James Haley VA
Hospital, and then at the West Palm Beach VA facility.  If
Plaintiff has PION, the Court does not know why Plaintiff suffers
from photosensitivity that requires him to wear dark glasses
constantly.

     The bottom line is that while there are certain risk factors
that are known to be associated with PION, PION has also occurred
in situations in which risk factors are not present.  Dr. Newman
testified that each person may vary slightly anatomically, and
this anatomical variation may be a cause that triggers PION.
There is no means to examine the posterior vessels of the eye to
predict when this will occur.  Dr. Hamburger, Plaintiff's expert
witness, examined Plaintiff and found no small vessel damage
visible.  Dr. Newman did not examine Plaintiff, but reviewed
medical records and found no documentation of damage to
Plaintiff's vasculature.

     Dr. Newman testified that the cause of PION is still not
known to medical science, and there is no effective treatment
that cures PION.  Because the cause is not known, it is not
possible to predict when PION will occur.

     The Court notes that when it was necessary for Plaintiff to
have his right hip replaced, Plaintiff went to California and
used a different team of physicians.  Various doctors performed
testing that revealed that Plaintiff is homozygous for a
prothrombin gene mutation which might render Plaintiff at an
increased risk for venous thromboembolism.  When Plaintiff's
surgery was done, he was given several units of blood.  Plaintiff

Case No. 8:02-CV-413-T-17EAJ

did not sustain any further damage to his vision after the second
surgery.  The Court observes that the second team of physicians
acted with the clarity of hindsight, and with the knowledge of
the ischemic event that occurred during the initial surgery.  In
other words, those physicians had a reason to further test and
evaluate Plaintiff before the second surgery, and to elect to
proceed differently.  As a result, the Court has not accorded the
opinions of those physicians any weight in reaching a conclusion
in this case.

        After consideration, the Court concludes that Plaintiff has
not established by a preponderance of the evidence that the
damage to his vision was caused by the medical treatment rendered
by the health care providers at the Bay Pines VA Medical Center.

IV.  Conclusion

        Doctors are required to render medical care that meets the
required standard of care, but doctors can never guarantee
results.  Plaintiff has not shown by a preponderance of the
evidence that the physicians, nurses or staff of the Bay Pines VA
Medical Center acted negligently in their treatment and care of
Plaintiff.  Plaintiff has suffered a severe, unexpected and
tragic loss, but it is not a loss that medical science knows how
to predict.  The Court therefore directs that judgment be entered
for Defendant.

Case No. 8:02-CV-413-T-17EAJ

**DONE and ORDERED** in Chambers, in Tampa, Florida on this 22ND day of July, 2005.



ELIZABETH A. KOVACHEVICH
United States District Judge

Copies to:
All parties and counsel of record

29